## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JOHN B. DUFFY,                                          CIVIL NO. 05-2638 (JNE/AJB)

        PLAINTIFF,

V.                                                      **REPORT AND RECOMMENDATION ON THE**
                                         **PARTIES' CROSS MOTIONS**
                                         **FOR SUMMARY JUDGMENT**

JO ANNE B. BARNHART, COMMISSIONER OF
SOCIAL SECURITY,

        DEFENDANT.

---

Mary F. Hastings, Esq., for Plaintiff, John B. Duffy.

Lonnie F. Bryan, Assistant United States Attorney, for Defendant, the Commissioner of Social Security.

---

## I.   INTRODUCTION

Plaintiff John B. Duffy ("Duffy") disputes the unfavorable decision of the Commissioner of the Social Security Agency ("Commissioner") denying his claim for a period of disability and disability insurance benefits under Title II of the Social Security Act.  This matter is before the court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross motions for summary judgment.  *See* 28 U.S.C. § 636 (b)(1) and Local Rule 72.1. Based on the reasoning set forth below, this Court **recommends** that Duffy's Motion for Summary Judgment [Docket No. 10] **be denied** and that the Commissioner's Motion for Summary Judgment

1

[Docket No. 12] **be granted**.

## II.    ISSUES BEFORE THE COURT

The primary issues before the Court are: (1)  whether Administrative Law Judge ("ALJ")

William G. Brown erred in discounting the treating physician and consulting physician opinions; (2)

whether the ALJ erred in not giving the appropriate weight to the substantial evidence in the record; and

(3) whether the ALJ erred in his determination of Duffy's credibility.

## III.   PROCEDURAL HISTORY

Duffy filed an application for Disability Insurance Benefits ("DIB") on September 12, 2002,

alleging disability as of July 1, 1999.  (T. 107-109.)  Duffy alleges disability due to radiating back pain

and migraine headaches.  (T. 125.)  Duffy amended his onset date of disability to February 23, 2002.

(T. 125, 555.)[1]   The state agency denied Duffy's claim initially and on reconsideration.  (T. 38-41, 59-

63, 66-69.)  Duffy made a timely request for a hearing.

On November 18, 2004, ALJ Brown conducted an administrative hearing regarding Duffy's

application for DIB.  ALJ Brown held a supplemental hearing on February 17, 2005.  On March 12,

2005, ALJ Brown issued an unfavorable decision, finding that while Duffy was not able to perform his

past relevant work, he was able to perform other jobs which existed in significant numbers in the local

and national economy.  (T.14-33.)  Duffy filed a request for review to the Appeals Council.  The

Appeals Council denied review, making ALJ Brown's decision the final decision of the Commissioner.

---

[1]Duffy previously filed a an application for DIB on January 3, 2001.  Duffy's claim was denied by the ALJ on February 22, 2002.  Duffy did not seek judicial review (T. 42-53).  Duffy amended his alleged onset date of disability to February 23, 2002 (T. 125, 555).

Based on the Commissioner's final decision denying DIB, Duffy filed an action in this Court to reopen the matter. Both parties have filed motions for summary judgment.

## IV.   FACTUAL BACKGROUND AND MEDICAL HISTORY

Duffy was born on December 9, 1959, and was 44 years old at the time of the hearing before ALJ Brown. (T. 556.) Duffy has completed high school. (T. 131.) His previous work experience includes ten years at a telemarketing company and he spent some of that time in a supervisory and managerial role. (T. 138, 558.)

Duffy allegedly injured his back in August of 1998 while moving a copier machine. (T. 559.) Duffy claims he was prescribed medication and underwent physical therapy for his back pain. (T. 559.) In May 1999, Duffy contends his doctor referred him to a neurologist at the University of Wisconsin for an EMG.[2] (T. 559.) Duffy asserts that a physician hooked his left foot up to an electrical machine. (*Id.*) Duffy claims a ring of electricity went up his leg to his spine and then to his head where he felt like his brain was being short circuited. (*Id.*) He attributes his headaches to this electrical shock. (T. 560.) Duffy contends that since this electrical shock he has experienced intense headaches that have prevented him from doing anything. (*Id.*) The Court notes that there is no medical report in the record that shows Duffy had an EMG performed at the University of Wisconsin or that a problem resulted that day. The only evidence in the record is Duffy's testimony regarding this purported EMG and the purported electrical shock that resulted from it. (*Id.*)

_____

[2] EMG or alternatively called electromyography is a test that assesses the health of the muscles and nerves controlling the muscles. *MedlinePlus Encyclopedia* at http://www.nlm.nih.gov/medlineplus/ency/article/003929.htm

On August 22, 1999, Duffy went to Columbia Park Clinic (urgent care) seeking treatment for back pain and a migraine headache.  (T. 227.)  On examination, Duffy had "severe painful reaction to minimal manipulations."  (*Id.*)  Duffy demonstrated "give away weakness in all muscles tested, but he was able to ambulate [without] difficulty" and had negative straight-leg raising.  (*Id.*)  Duffy refused the doctor's offer of Relafen.[3]  However, Duffy requested Percocet[4] and the doctor refused.  Duffy then left with Relafen.  (*Id.*)

Duffy went to the hospital in June 2000, complaining of back pain and tingling in his left leg.  (T. 279-280.)  In the emergency room, Duffy was given Demerol[5] and Vistaril.[6]  (T. 280.)  A physical exam showed no significant abnormalities.  (*Id.*)   Dr. Roth noted that the "patient exam [was] difficult as [Duffy's] cooperation [was] not very consistent."[7]  (*Id.*)  Dr. Roth prescribed Vicodin[8] and ibuprofen to Duffy.  (*Id.*)

On October 18,  2000, the police brought Duffy to the hospital emergency room because he was asleep at a restaurant and could not be aroused.  (T. 277.)  At the hospital, Dr. Wilson noted that

---

[3]Relafen is a nonsteroidal, anti-inflammatory drug. **The PDR Family Guide to Prescription Drugs**, Three Rivers Press (8th ed. 2000).

[4]Percocet is a narcotic pain reliever.  (*Id.*)

[5]Demerol is a narcotic pain reliever.  (*Id.*)

[6]Vistaril is a antihistamine used to relieve symptoms of common anxiety.  (*Id.*)

[7]Dr. Roth describes such inconsistency: Duffy "on occasion is unable to even plantar flex his left foot against gravity, whereas on other occasions, he is able to provide some strength  against resistance." (T. 280.)

[8]Vicodin is a narcotic pain reliever.  (*Id.*)

Duffy is "quite intoxicated on a substance" and could not stay awake during the interview.  (T. 276-77.)

However, Duffy became violent in his haze when Dr. Wilson told him that he would be administering

Narcan[9] and consequently had to be restrained by two security officers and placed in a four point

restraint.   (T. 276.)  Dr. Wilson noted that Duffy's wife told him that Duffy was taking Hydrocodone[10]

and was not sure where he obtained it.  Notably, Duffy's wife indicated to Dr. Wilson that Duffy  had a

"narcotic chemical dependency in 1988 and was hospitalized in a treatment program at Mercy for some

length of time."  (T. 277.)

On January 22, 2001, Duffy went to the hospital with complaints of back pain and a headache.

(T. 270.)  Dr. Henry Dahlman noted that he did "not see any acute reason to admit this patient to the

hospital.  He needs to go and see his regular physician with regards to his chronic narcotic use..." (*Id.*)


On February 22, 2001, Duffy drove himself to the hospital and complained that he had a

migraine headache.  (T. 265.)  Duffy told Dr. Jason Roth that he experienced a headache three to four

months ago and that Demerol and Vistaril helped resolve his symptoms. (*Id.*)  Dr. Roth had a long talk

with Duffy regarding his "chronic use of Vicodin" and "repetitive need for Demerol and Vistaril."  (T.

265.)  Dr. Roth gave Duffy Demerol and Vistaril after voicing his concerns regarding these drugs.  (*Id.*)

Dr. Roth diagnosed Duffy with a headache and possible drug seeking behavior.  (T. 264.)   A CT scan

of Duffy's head was performed on March 16, 2001 and results were normal.  (T. 263.)

---

[9] Narcan is used for preparation of naloxone which is a potent narcotic antagonist. *MedlinePlus Encyclopedia* at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html

[10]Hydrocodone is a habit forming compound derived from codeine.  (*Id.*)

Duffy also went to the hospital on July 2-3, 2001, with complaints of a toothache.  (T. 258-62.)

Dr. Joseph Lynch performed a dental block and injected medicine into Duffy's mouth.  (T. 261.)

However, Duffy still complained of pain and requested that Dr. Lynch inject more medicine.  (*Id.*)  Dr.

Lynch noted that "he was uncomfortable injecting any more local given the amounts that [he] already

placed."  (*Id.*)   Dr. Lynch gave Duffy Percocet and encouraged him to follow up with his dentist.  (*Id.*)

Duffy returned to the hospital later in the day still complaining of his toothache.  (T. 259.)  Dr. Roth

noted his concern for Duffy's "drug seeking behavior."  (*Id.*)

On November 7, 2001, Duffy drove himself to the hospital and complained of a migraine

headache.  (T. 254.)  Dr. Mari Ito noted that Duffy was given Demerol and Vistaril.  (T. 253.)  The

following day,  Duffy went to Columbia Park Clinic (urgent care) complaining of chronic migraines and

back pain.  (T. 220.)  Duffy told Dr. Ronald Jankowski that his headache the day before "was a 10

[and] today is a 3."  (*Id.*)  Dr. Jankowski prescribed Percocet to Duffy.  (*Id.*)  Dr. Jankowski referred

Duffy to a neurologist and recommended an MRI of Duffy's back.  (*Id.*)

An MRI of Duffy's upper back in November 2001 was unremarkable.  (T. 185.)  Duffy also

had an MRI of his lower back which showed "some mild disc degeneration."  (*Id.*)   An MRI of the

brain was unremarkable except for "mild white matter signal changes which are nonspecific in character

and distribution."  (T. 184.)  The report listed many possibilities for this result which included migraine

headaches.  (*Id.*)  However, the report did not state conclusively which, if any of these possibilities,

were the cause. *(Id*.)

On November 26, 2001, Dr. Jankowski noted that the MRI results of Duffy's back were

negative, but indicated that the MRI of Duffy's brain revealed abnormalities.  (T. 218.)  Dr. Jankowski

referred Duffy to a neurologist and refilled his prescription for Percocet. (*Id.*)  On November 29, 2001,

Duffy saw Dr. Jankowski and complained of headaches.  (T. 217.)  Duffy informed Dr. Jankowski that

he missed his scheduled appointment with the neurologist.  (*Id.*)  Dr. Jankowski noted that this was the

second time that Duffy missed his scheduled appointment with the neurologist and then sought treatment

from Dr. Jankowski.  (*Id.*)  Duffy requested medicine for his headache and Dr. Jankowski gave him 10

mg of MS IM.  (*Id.*)  Dr. Jankowski noted that he was very frustrated with Duffy because he was trying

to help him and "he keeps avoiding doing what needs to be done to get his condition improved."  (*Id.*)

On December 5, 2001, Duffy saw Dr. Thomas Murphy, a neurologist.  (T. 289-90.)   Dr.

Murphy reviewed the abnormal MRI of Duffy's brain.  (*Id.*)  He noted in his letter to Dr. Jankowski

that he did "not believe that the headaches [were] caused by the white matter abnormalities; however,

they may be related in that these types of changes can be seen in migraine headaches."  (T. 290.)   Dr.

Murphy concluded that "the MRI changes are most likely due to a combination of migraine and

hypertension, rather than to any ongoing neurological disease that could be causing headaches." (*Id.*)

Dr. Murphy recommended that Duffy continue taking Propanolol[11] for headache prevention and his

hypertension.  (T. 289.)

On January 7, 2002, Duffy saw Dr. Jankowski to follow up on his hypertension and lab work.

(T. 206.)  Duffy indicated to Dr. Jankowski that his headaches are less frequent.  (*Id*.)  Dr. Jankowski

noted that he was deferring treatment of Duffy's headaches and pain condition to Dr. Murphy.  (*Id*.)

---

[11]Propanolol or Inderal is "a type of medication known as a beta blocker; is used in the
treatment of high blood pressure...prevention of migraine headache..."  **The PDR Family Guide to
Prescription Drugs**, Three Rivers Press (8th ed. 2000).

Later that same month, Duffy saw Dr. Jankowski with complaints of chronic back pain and leg pain. (T. 201.)  However, Duffy stated that "his headaches [were] improving."  (*Id.*)  Duffy told Dr. Jankowski that "he was doing much better when he was on the pain med and muscle relaxants."  (*Id.*)  However, Dr. Jankowski told Duffy that those could not be continued indefinitely.  (*Id.*) Dr. Jankowski instructed Duffy to go to the pain clinic.  (*Id.*)

On February 22, 2002, Duffy went to urgent care complaining of lower back pain and pain in his left leg.  (T. 196.)  The physician refilled Duffy's Vicodin and tried to schedule him a physical therapy session.  (*Id.*)  However, Duffy claimed he could not attend physical therapy because he worked 8 a.m. to 6 p.m. daily.  (*Id.*)

On February 28, 2002, Duffy went to urgent care upon referral of Dr. Sahlstrom with complaints of lower back pain (T. 195.)  Duffy told Dr. Flood that his lower back has been hurting for weeks because he slipped on ice while carrying a bag of groceries.  (Id.)  Dr. Sahlstrom had provided Duffy with some Soma[12] and Vicodin.  (*Id.*)  Dr. Flood noted that Dr. Sahlstrom wanted Duffy to go to physical therapy.  (*Id.)*  However, Duffy claims there was a scheduling problem because his job that started at 9:00 a.m.  (*Id.*)  The Court notes that Duffy's work history  indicates that he last worked in February 2000.  (T. 137.)  Moreover, Duffy claims his onset date of disability is February 23, 2002, yet Duffy indicated to the doctor that he could not attend physical therapy because of his job. (T. 14, 195.)  Dr. Flood noted that he reviewed the MRI of Duffy's back from November 2001 and concluded that it was "completely normal other than some degeneration at L5-S1."  (T. 194.)

---

[12]Soma is "used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms."  *Id.*

In May 2002, Duffy went to the hospital because he apparently re-injured his back carrying 40 pound bags of salt.  (T. 188.)   The physician diagnosed Duffy with lower back pain and prescribed Vicodin.  (*Id.*)  However, the doctor did not prescribe any narcotic medications due to Duffy's history of visiting urgent care and seeking Percocet and other narcotic medications.  (T. 189.)   On August 5, 2002, Duffy went to the hospital complaining that he had a headache for the last four days.  (T. 247.) Duffy was given 100 mg of Demerol, 75 mg of Vistaril, morphine IV, and Toradol.[13]  (*Id.*)  A CT scan of the head was negative.. (*Id.*)

On February 21, 2003, Duffy saw Dr. Nathan Norquist for "ongoing treatment of chronic headaches, backaches, and high blood pressure."  (T. 344.)   Duffy indicated to Dr. Norquist that ever since the EMG in May 1999, "he has had problems with chronic headaches" that are spontaneous in nature and "are associated with a pulsating pain which is generalized in his head, extending back towards the nape of his neck accompanied by dizziness and blurry vision." (T. 345.) Dr. Norquist prescribed 50 mg of Atenolol[14] to be taken daily.  (*Id.*)  Dr. Norquist noted that Duffy had a blood pressure of 144/96 and the remainder of his examination was unremarkable. (*Id.*)

On March 31, 2003, Duffy had a follow up visit to Dr. Norquist for high blood pressure, chronic headaches, and lower back pain.  (T. 341.)  Dr. Norquist refilled Duffy's Atenolol and his narcotic pain medication with 30 Vidcodin tablets.  (T. 342.)  Dr. Norquist explained to Duffy that this

---

[13]Toradol is "a nonsteroidal anti-inflammatory drug and is used to relieve moderately severe, acute pain." *Id.*

[14]Atenolol or tenormin is "a type of medication known as a beta blocker, is used in treatment of high blood pressure...Occasionally doctors prescribe Tenormin for treatment of alcohol withdrawal, prevention of migraine headaches, and bouts of anxiety." *Id.*

9

medicine should last him for one month.  (*Id.*)  However, on April 14, 2003, Dr. Norquist noted that

Duffy "ran out of his Vicodin prescription early because he needed to use it more frequently for the

management of his worsened headaches."  (T. 340.)  Examination was unremarkable. (*Id.*)

An MRI from May 9, 2003,  showed "multiple white matter lesions" that appeared "essentially

stable when compared to the prior examination" and was otherwise normal. (T. 355.)  Dr. Norquist

noted on May 20, 2003, that Duffy's MRI showed "stable white matter changes in the periventricular

region" and was otherwise normal.  (T. 336.)  Duffy informed Dr. Norquist that his use of MS Contin[15]

has worked fairly well for the management of his headaches.  (*Id.*)  Dr. Norquist referred Duffy to the

"MAPS Pain Clinic to evaluate for long term management of his chronic headaches."  (*Id.*)

Dr. Norquist noted on August 21, 2003 that Duffy's migraine headaches "have been controlled

with OxyContin[16] 20 mg twice daily for the past six months." (T. 328.)  Dr. Norquist also noted that

Duffy was out of town at a wedding.  (*Id.*)   Duffy claims that while he was at the wedding his

medications were either lost or stolen and consequently he went to the emergency room for medications

and treatment of his headache.  (*Id.*).  On September 12, 2003, Duffy reported to Dr. Norquist that

OxyContin helped control his headaches better than Topamax.  Duffy requested an increase in his

dosage of OxyContin from 20 mg to 40 mg.  (T. 326.)  Dr. Norquist noted his concern regarding the

longer term management of Duffy's migraines using OxyContin.  (*Id.*)  Dr. Norquist increased Duffy's

dose to 20 mg three times daily and requested that Duffy follow-up with a neurologist.  (*Id.*)  Dr.

---

[15]MS Contin is "a controlled-release tablet containing morphine, is used to relieve moderate to severe pain."  (*Id.*)

[16]OxyContin is a narcotic drug for treatment of moderate to severe pain.  *U.S. Food and Drug Administration* at http://www.fda.gov/cder/drug/infopage/OxyContin/

Norquist noted on October 10, 2003, that Duffy failed to follow-up with neurology as he had requested at his last visit.  (T. 324).

On January 22, 2004, Dr. Norquist completed a Social Security Headache RFC Questionnaire.  (T. 358.)  Dr. Norquist indicated on the questionnaire that he treated Duffy for chronic migraine headaches.  (*Id.*)  Dr. Norquist indicated that Duffy's headaches were severe and occurred several times a day.  (T. 358-59).  Dr. Norquist also noted that Duffy was incapable of even low stress jobs and basic work activities.  (T. 359, 361.)   Dr. Norquist opined that Duffy was incapable of functioning on a part-time basis in a competitive work environment.  (T. 360.)  In addition, Dr. Norquist indicated that if Duffy became employed, then he estimated that Duffy would likely miss work four or more times a month due to symptoms related to his headaches.  (T. 362.)  However, Dr. Norquist noted normal neurological exams and MRI results.  (T. 359-60.)

Duffy saw Dr. Norquist on April 23, 2004 and reported that his headaches had worsened and sometimes lasted three or four days.  (T. 364.)   Dr. Norquist noted that Duffy declined admission to the Maps Pain Clinic.  (*Id.*)  Dr. Norquist recommended that Duffy follow-up with a neurologist regarding his headaches.  (*Id.*)

On June 9, 2004, Duffy went to the emergency room complaining of a headache.  (T. 412.)  Duffy stated that he was going to kill himself because he could not take the headaches any more.  (*Id.*)  Dr. Kathy Kroshus noted in her report that Duffy was given a significant amount of narcotics for his headache.  (*Id.*)  Duffy was admitted to the psychiatric unit.  (*Id.*)  The following day, Duffy reported that he felt better and had no intent to kill himself.  (T. 420.)  Duffy agreed to take Vistaril with his OxyContin.  (*Id.*)

On June 30, 2004, Duffy went to the hospital "for severe headaches and some possible narcotic abuse and withdrawal." (T. 469.) Duffy reported that he was taking OxyContin as prescribed by Dr. Norquist, but also would buy it on the street. (T. 471.) Dr. Sultan Michael indicated that Duffy's headaches were "adequately managed after he was tapered off narcotics through neurology, and he was put on tapering of steroids . . . ." (T. 469.) A CT scan of Duffy's head showed no abnormalities. (T. 487.)

On July 20, 2004, Duffy saw Donald E. Wiger, Ph.D., L.P. for evaluation. Duffy reported that he had severe headaches three to four days per week which affected his ability to engage in activities. (T. 428.) Duffy also stated that he sometimes watched television and would go to church. (*Id.*) Duffy indicated that he tried to do chores if he was able and would help his child with their homework. (*Id.*) Duffy stated that he sometimes went shopping. (*Id.*) Dr. Wiger noted that Duffy appeared to be in good health, but had "clear pain movements." (T. 430.) Dr. Wiger indicated that Duffy appeared to have normal intellectual functioning. (*Id.*) Dr. Wiger noted that there was no evidence of a personality disorder. (*Id.*) Dr. Wiger attributed Duffy's low IQ score to the pain affecting his ability to concentrate during the interview. (*Id.*) Dr. Wiger felt that Duffy's true IQ was most likely in the normal range. (T. 431.) The results from The Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test was invalid which suggested "either a cry for help or exaggeration of symptoms." (*Id.*) Dr. Wiger opined that Duffy is "able to understand directions" and "carry out mental tasks with reasonable persistence and pace, depending on his level of pain . . . ." (*Id.*) Dr. Wiger also opined that Duffy is "able to handle the emotional stressors of the workplace." (*Id.*)

On August 6, 2004, Duffy went to the emergency room complaining that he took approximately

15 pills of Amitriptyline[17] for a severe headache.  (T. 435.)  Duffy admitted that he was trying to

commit suicide when he took the Amitriptyline.  (*Id.*)  Dr. Alan Fuller noted in his report that there were

no significant clinical abnormalities.  (*Id.*)  Duffy was admitted to psychiatry for observation.  (*Id.*)  At

the psychiatric unit, Duffy met with Dr. Samina Raja and described his complaints of chronic migraines

and back pain.  Dr. Raja noted that it was interesting that Duffy did not bring up the purported cause of

his migraines (i.e., the EMG that allegedly electrocuted him) at the beginning of the interview while

describing his headaches and "did not seem to believe that this event might have precipitated his

headaches."  (T. 439.)

      Duffy also reported to Dr. Raja that the OxyContin improved his back pain such that he felt like

a "million dollars."  (*Id.*)  However, Duffy gave vague responses to Dr. Raja when questioned about the

effectiveness of OxyContin and the other medications he was taking for his headaches.  (*Id.*)   Dr. Raja

noted in the mental status examination that Duffy was "alert and oriented."  (T. 441.)  Notably, Dr. Raja

opined that Duffy was "enthused to talk about his life and did not seem to have any severe headache, at

least at the time of this interview."  (*Id.*)  Finally, Dr. Raja opined that "the patient's diagnosis is unclear

at this time.  His presentation is vague.  It is not clear if he is exaggerating his symptoms or if there is

some relation between his symptoms and some neurological condition that has been so far

undiagnosed."  (T. 443.)

      On August 15, 2004, Duffy went to the hospital complaining of a migraine headache.  (T. 491.)

---

[17]Amitriptyline or Elavil is "prescribed for the relief of symptoms of mental depression ...Some doctors also prescribe Elavil...to control chronic pain, to prevent migraine headaches...."   **The PDR Family Guide to Prescription Drugs**, Three Rivers Press (8th ed.)

A CT scan of Duffy's head was negative.  (T. 492.)  Duffy failed to list OxyContin as a medication he

was taking at the time of registration.  (*Id.*)  Duffy later claimed that he had a bottle of OxyContin, but

that it was either lost or stolen by hospital staff even though he did not list this as a medication he was

taking at the time of registration.  (*Id.*)   However, Duffy then reported to Dr. Deborah Croker that he

had taken two OxyContin tablets while he was in the hospital and did not tell anyone.  (*Id.*)  Dr. Croker

advised Duffy that OxyContin could only be prescribed though his regular care provider.  (T. 492-93.)

Dr. Croker offered Duffy the number of the patient representative, but he left without waiting for this.

(*Id.*)

On August 18, 2004, Duffy returned to the emergency room and was initially unclear about

why he was there.  (T. 453.)  Duffy reported to Dr. Robert Thomas that he has had headaches and

thinks they were "caused by a lightening strike many years ago."  (*Id.*)  Duffy was admitted to the

psychiatric unit because he claimed he might be suicidal.  (T. 454.)  Dr. Yoshiko Hapke noted that

Duffy refused to go to chemical dependency treatment.  (T. 455.)

Notably, Dr. Hapke indicated that he remembered Duffy from a previous admission.  (*Id.*) Dr.

Hapke noted that "the patient used to wait until later in the day to find out who [was] on call on that

day, and if he found that his attending doctor, Dr. McAllister, [was] not on call, he would ask

specifically for narcotics by name."  (*Id.*)

Dr. Hapke also noted that he observed Duffy from across the nursing station and indicated that

he was "relaxed, checking the yellow pages to make phone calls, [and] talking to other patients."  (T.

456.)   However, when Dr. Hapke approached Duffy, he "immediately changed to guarded" and was

"selectively a poor historian [and] very manipulative."  (T. 458.)  Duffy's father told Dr. Hapke that his

14

son would "collect 'bottles' of narcotic pills, abusing them, and used to take them in the 'handfuls.'" (T. 456.)  Duffy's father also reported that there is no previous history of hallucination, delusion or paranoia.  (*Id.*)  Significantly, Dr. Hapke noted that Duffy "has a history of lying and also being manipulative." (*Id.*)  Moreover,  Duffy's chart indicates that he has a history of lying about his drug use. (*Id.*)

Dr. McAllister noted that Duffy was picked up by the police again for being under the influence of drugs.  (T. 462.)  Dr. McAllister indicated a diagnosis of a primary chemical dependency problem with methamphetamines, opioids, and other illicit drugs.  (T. 461.)  Dr. McAllister noted that Duffy has been taking OxyContin for his headaches, but "given his history of polysubstance dependence and continued use of illegal drugs, he was well aware that narcotics are contraindicated for him."  (*Id.*) Duffy has previously indicated to doctors that he would attend chemical dependency treatment, but has not followed through.  (*Id.*)  Dr. McAllister noted that Duffy has been on medications in the past, but fails to comply with them.  (*Id*.)  Thus, Dr. McAllister did not prescribe any narcotics for Duffy and strongly encouraged him to attend chemical dependency treatment.  (T. 463.)

On September 6, 2004, Duffy went to a chemical dependency unit for OxyContin abuse.  (T. 495.)  Dr. Dunn noted that Duffy had a 29 year history of chemical dependency behavior.  (T. 496.) Dr. Dunn noted that Duffy's insurance was not effective because he had already had two treatments in the previous 12 months.  (T. 495.)  Consequently, Duffy was discharged and referred to a support group.  (*Id.*)  Dr. Dunn noted that it was unlikely Duffy would seek any help.  (*Id.*)  Dr. Dunn noted in his examination that Duffy was "complaining to the least touch on his back [and doubts] that he has any serious back problems."  (T. 499.)

15

On October 9, 2004, Duffy went to the emergency room with complaints of a migraine headache. (T. 509.)   Dr. Carly Evans noted no problems with Duffy's vision and Duffy denied that he had any neurological deficits. (*Id.*)  Duffy reported that he has used narcotics to treat his headaches and has also "tried meth and cocaine." (T. 510.)  Dr. Evans noted her concern for Duffy's drug-seeking behavior based on his previous visits to the hospital. (*Id.*)  Dr. Evans also expressed concern about Duffy seeking illegal drugs on the street in order to "treat his pain" and "she did not feel comfortable giving him any further narcotics." (*Id*.)  Notably, Duffy claimed suicidal thoughts when Dr. Evans informed him that he was about to be discharged. (T. 511.)  Dr. Evans noted her suspicion of Duffy's behavior because he had not indicated that he was suicidal until he was about to be discharged without narcotic medication. (*Id.*)  Hospital staff contacted Dr. McAllister and he reported that Duffy had a history of drug-seeking behavior. (*Id.*)  Dr. McAllister and a psychiatric counselor did not believe Duffy posed a significant risk for committing suicide. (*Id.*)  Dr. Evans agreed with this assessment and did not prescribe any narcotics to Duffy upon his discharge. (*Id.*)

Duffy saw Dr. James Moriarty, a neurologist, on November 18, 2004, for a consultation on his headaches. (T. 538-39.)   A neurological exam was normal. (T. 538.)  However, Dr. Moriarty's assessment was that Duffy had severe migraine headaches and consequently prescribed pain medication. (T. 539.)  On January 12, 2005, Duffy saw Dr. Moriarty again with complaints that his headaches are now associated with blurred vision. (T. 540.)  Dr. Moriarty reviewed the May 9, 2003 MRI of Duffy's head and concluded it was normal. (*Id.*)  Dr. Moriarty refilled certain pain medications, but refused Duffy's request for OxyContin. (*Id.*)

On January 4, 2005, Duffy arrived at the emergency room "in a state of acute

16

methamphetamine intoxication, with methamphetamine-induced psychosis." (T. 521.)  The discharge

note indicated that Duffy had arrived in the emergency room on previous occasions with

methamphetamine-induced psychosis and has a history of polysubstance abuse.  (*Id.*)  The discharge

note also indicated that Duffy has turned to street drugs in order to help reduce the pain from his

headaches.  (*Id.*)  The physician indicated that he found Duffy's story regarding his headaches to be

"quite convincing."  (*Id.*)  Notably, Duffy threatened to hang himself with a bed sheet if the doctor did

not give him OxyContin.  (*Id.*)  The doctor placed Duffy in seclusion without any narcotics and he

quickly recovered from this.  (*Id.*)  Duffy stated he was not suicidal and admitted that he was merely

attempting to get narcotic medications.  (*Id.*)  Duffy also indicated that he was not interested in

psychiatric or chemical dependency treatment.  (T. 522.)

## V.   TESTIMONY AT ADMINISTRATIVE HEARING

An administrative hearing took place before ALJ Brown on November 18, 2004.  (T. 14,

550.)  ALJ Brown held a supplemental hearing on February 17, 2005.  (T. 14, 585.)  Duffy was

present and testified, as did Robert Brezinski, a vocational expert, and Dr. Andrew Steiner, a medical

expert.  (T. 550, 558.)

Duffy testified that he receives food stamps and relies upon his wife to pay all the bills.  (T.

557.)  Duffy testified that he last worked in January 2000.  (*Id.*)  He testified that his headaches started

immediately after the purported shock he received from an EMG in May 1999. (T. 568-69.)  Duffy

indicated that his headaches are very intense.  (T. 561.)  Duffy also made complaints of lower back

pain.  (*Id.*)

Duffy  testified that once he gets a headache, then it will last all day.  (T. 564.)  He stated that

he has had a headache "pretty much everyday" dating back to 2002.  (T. 565, 570.)  Duffy also

indicated that his headaches started to become worse in 2003.  (T. 571.)  Duffy explained that he

would spend weeks in a dark room to help deal with his headaches.  (*Id*.)  He also testified that in the

last six months, he has started using street drugs such as cocaine and meth,  to see if that would help.

(T. 568.)   He testified that he is no longer using street drugs.  (Id.)  Duffy testified that OxyContin

would help reduce the pain of his headaches.  (T. 569.)

 Duffy  indicated that he recently had more pain on the left side of his head.  (*Id.*)  He testified

that his use of street drugs helped reduce the pain of his headaches, but when he stopped using the

street drugs, his headaches became worse.  (*Id.*)  Finally, Duffy testified that he was currently taking

Advil and Excedrin for his headaches.  (T. 573.)

Dr. Steiner then testified about Duffy's various impairments.  (*Id.*)  Dr. Steiner discussed

Duffy's reports of lower back pain, headaches, and substance abuse.  (T. 573-74.)   Dr. Steiner

opined that Duffy did not have any physical impairments that resulted in work limitations.  (T. 574-75.)

Dr. Steiner also testified at the supplemental hearing that Duffy's "[c]ompliance with medications has

been problematic . . . ."  (T. 594.)  Dr. Steiner testified that the MRI results showing white matter

lesions were not significant as far as "limiting any of [Duffy's] physical activities and probably not

related to the headaches."  (T. 594-95.)  Finally, Dr. Steiner concluded that he did not see enough

objective findings in the record that would indicate limitations from a physical point of view.  (T. 596.)

The vocational expert, Robert Brezinski, testified at the administrative hearing  (T. 578.)  The

ALJ posed a hypothetical to the vocational expert ("VE") based on Duffy's background, education,

past relevant work, the medical evidence in the record (i.e., degenerative disk disease, migraine

headaches), and moderate limitations on activities of daily living, social function indicating concentration, persistence, and pace.  (T. 579.)  Included in the hypothetical were the following limitations: (a) lifting occasionally 20 pounds and frequently 10 pounds; (b) with a sit/stand option one time every 2 hours; (c) no working around heights, ladders, or scaffolds; (d) no operating of foot pedals or working around hazardous or dangerous equipment; (e) occasional stooping, crouching, crawling, twisting, bending or climbing; (f) capacity to concentrate, understand, and remember routine repetitive instructions and carry out routine, repetitive tasks; (g) interact with coworkers, supervisors, and the public on a brief and superficial basis; and (h) coping with the ordinary levels of supervision and tolerating the routine stresses of a routine, repetitive setting.  (T. 579-80.)

Based on that hypothetical, the VE testified that Duffy could not perform his past relevant work because he would be limited to brief and superficial contact with others.  (T. 580.)  The VE also testified that the Duffy would have skills that would be transferrable to other work.  (*Id.*)  The VE explained that Duffy has skills that could transfer to semi-skilled work such as a switchboard operator or clerical sorter.  (T. 580-81.)  The VE testified that there would be jobs in the regional economy that a person under the hypothetical would be able to perform.  (T. 581.)  The VE explained that the hypothetical individual could perform work as a cashier (30,000 to 32,000 jobs in the regional economy), assembly type work (9,000 to 10,000 jobs in the regional economy), and injection mold machine operator (4,000 to 5,000 jobs in the regional economy).  (*Id.*)

## VI.    THE ALJ'S FINDINGS AND DECISION

On March 12, 2005, ALJ Brown issued his decision denying Duffy's application for DIB.  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or has

lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C.

§§ 416(i)(1)(A).  However, an individual is not disabled if alcoholism or drug addiction is a contributing

factor material to the determination that the individual is disabled.  (Pub. L. 104-21 § 105 (a) (codified

at 42 U.S.C. § 423(d)(2)(C)).  The ALJ followed the sequential five-step procedure as set out in the

rules.  *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a).  The Eighth Circuit has summarized these

steps as follows:

> The Commissioner must determine: (1) whether the claimant is presently engaged in
> "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that
> significantly limits the claimant's physical or mental ability to perform basic work
> activities; (3) whether the claimant has an impairment that meets or equals a
> presumptively disabling impairment listed in the regulations (if so, the claimant is
> disabled without regard to age, education, and work experience); (4) whether the
> claimant has the residual functional capacity [RFC][18] to perform his or her past relevant
> work; and (5) if the claimant cannot perform the past work, the burden shifts to the
> Commissioner to prove that there are other jobs in the national economy that the
> claimant can perform.

*Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

Based on the above, the ALJ determined that Duffy met the requirements for the first two steps

of the disability determination procedure.  (T. 18-19.)  The ALJ found that Duffy has not engaged in

substantial gainful activity since his alleged onset date, February 23, 2002.  (T. 32.)  Regarding the

second step, the ALJ found that Duffy's migraine headaches, degenerative disc disease of the lumbar

spine, adjustment disorder, borderline personality disorder, and polysubstance dependency are

---

[18]A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or
mental limitations.  20 C.F.R. § 404.1545.

considered "severe" based on the requirements in regulations.  (*Id.*)  Regarding step three, the ALJ found that Duffy was not disabled because of his polysubstance dependency pursuant to 42 U.S.C. § 423(d)(2)(C).  (*Id.*)  The ALJ also found that "independent of polysubstance dependency, [Duffy] do[es] not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4."  (*Id.*)  The ALJ explained that Duffy's allegations regarding his limitations were not fully credible.  (*Id.*)

The ALJ then proceeded to evaluate Duffy's RFC.  ALJ Brown determined that independent of polysubstance dependency, Duffy "has the following residual functional capacity: lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking 6 hours of an 8 hour day; sitting 6 hours of an 8 hour day; sit/stand option at least every 2 hours; no work at heights or on ladders or scaffolds; no work near hazards or dangerous equipment; no operation of foot pedals; only occasional stooping, crouching, crawling, twisting, bending, and climbing; routine, repetitive tasks; brief and superficial contacts; and routine stressors."  (*Id.*)  Based on the RFC, and considering Duffy's age, experience, and past work experience, and the testimony of the VE, the ALJ determined that Duffy could not perform his past relevant work, but that he would be able to perform other jobs which existed in significant numbers in the regional and national economy independent of polysubstance dependency. (*Id.*)  Accordingly, ALJ Brown found that Duffy was not disabled under the regulations imposed by the Social Security Act. (*Id.*)

## VII.  DISCUSSION

### A.    *Standard of Review*

This Court will affirm the ALJ's findings that the claimant was not under a disability if the

findings are supported by substantial evidence based on a review of the entire record. *Haley v.*

*Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). "Substantial evidence is less than a preponderance,

but enough that a reasonable mind might accept it as adequate to support a decision." *Id.* (quoting

*Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). The review the Court undertakes, however,

must go beyond solely the examination of the record for evidence in support of the Commissioner's

decision. *Id.* The Court must additionally examine the record for evidence that detracts from that

decision. *Id.* Nevertheless, as long as there is substantial evidence to support the decision, this Court

will not reverse it simply because substantial evidence exists in the record that would support a contrary

outcome or because this Court might have decided differently. *Id.*

      B.      *Analysis of Decision*

      Duffy argues that this Court should reverse the ALJ's unfavorable decision for two primary

reasons. First, Duffy asserts that the ALJ erred in rejecting the opinions of Duffy's treating physicians.

Duffy also argues that the ALJ did not give appropriate weight to substantial evidence in the record and

that the ALJ erred in his determination of Duffy's credibility.

      Generally, "a treating physician's opinion is due controlling weight [in a social security disability

benefits case] if that opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Hogan*

*v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (quotations omitted); 20 C.F.R. § 404.1527(d)(2).

However, a statement from a medial source that a claimant is "disabled" or "unable to work" does not

necessarily mean that the Commissioner will find the claimant disabled. 20 C.F.R. § 404.1527(e)(1);

*Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004). Moreover, it is appropriate for the ALJ to

disregard a treating physician's opinion when it "consists of nothing more than vague, conclusory statements." *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004).

Duffy argues that Dr. Norquist's opinion on the Social Security Administration's Headache Questionnaire is evidence that Duffy cannot perform substantial gainful activity.  Dr. Norquist opined that Duffy was incapable of even low stress jobs and basic work activities.  (T. 359, 361.)  Dr. Norquist also opined that Duffy was incapable of functioning on a part-time basis in a competitive work environment and estimated that Duffy would likely miss work four or more days a month due to symptoms related to his headaches.  (T. 360, 362.)

The ALJ did not give Dr. Norquist's opinion significant weight because the objective findings did not support the severity and frequency noted by Duffy.  (T. 30.)  The Court agrees.  Dr. Norquist's opinion that Duffy was incapable of even low stress jobs was nothing more than a conclusory statement as he offered no explanation or objective evidence.  The ALJ was reasonable in his conclusion because Dr. Norquist indicated that Duffy's neurological exam and MRI results were normal.  (T. 359-60.)  Furthermore, the ALJ appropriately noted that the evidence in the record discredited Duffy's assertion of disability because it showed Duffy's noncompliance with medication, failure to follow medical treatment, and inconsistent and vague statements regarding the frequency and intensity of his headaches.  (T. 30.)

Duffy also argues that Dr. Wiger found his pain disorder to be a significant functional limitation on his ability to work.  However, Dr. Wiger also found  that Duffy is "able to understand directions" and  is "able to handle the emotional stressors of the workplace."  (T. 432.)  In addition, Dr. Wiger noted in a questionnaire that Duffy could "generally function well" or "satisfactorily" in all mental work-

related areas. (T. 433-34.)  Thus, it was reasonable for the ALJ to give little probative value to the

conclusory statement that Duffy was unable to work because of his pain as it was neither within Dr.

Wiger's expertise to determine Duffy's ability to work nor consistent with his findings of mild to

moderate limitations in all of Duffy's cognitive and other functional abilities.  (T. 433.)

Duffy also contends that the ALJ misinterpreted  Dr. Murphy's statements regarding Duffy's

MRI results.  The record shows that  Dr. Murphy did "not believe that the headaches are caused by the

white matter abnormalities; however, they *may* be related in that these types of changes can be seen in

migraine headaches."  (T. 290.) (emphasis added.).  However, the record also shows that Dr. Murphy

did not consider the MRI findings to be suggestive of any ongoing neurological disease. (T. 24.)   ALJ

Brown's analysis was reasonable here because he "may reject the opinion of any medical expert where

it is inconsistent with the medical record as a whole."  *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir.

2002).   The MRI report listed many possibilities for white matter abnormalities, but did not state

conclusively which, if any, were the cause.  (T. 184.)   Moreover, the ALJ's role is "to resolve conflicts

among the various treating and examining physicians."  *Estes*, 275 F.3d at 725 (8th Cir. 2002).

Notably,  Dr. Norquist opined that Duffy's MRI showed "stable white matter changes in the

periventricular region" and was otherwise normal.  Moreover, Dr. Steiner testified that the MRI results

showing white matter abnormalities were not significant in terms of any limitation on Duffy's physical

activities and were unlikely related to his headaches.  (T. 594-95.)

Finally, Duffy argues that Dr. Moriarty's opinion that Duffy suffers from severe migraine

headaches is evidence that he is disabled.  However,  Dr. Moriarty's opinion is inconsistent with his

own determination that Duffy's MRI results were normal.  (T. 540.)  The ALJ acknowledged that

Duffy had severe migraine headaches, but reasonably concluded based on the entire record that the headaches were not disabling. (T. 32.)  The 8th Circuit has held that "[a]n impairment which can be controlled by treatment or medication is not considered disabling." *Estes*, 275 F.3d at 725.   Here, the record shows that Duffy often reported improvement with his headaches when he complied with the medication prescribed by his doctors.  (T. 201, 206, 220, 265, 336, 412, 441, 456.)  Moreover, the ALJ noted that Duffy had a tendency to magnify his complaints of his headaches and back pain.  (T. 443.)   Furthermore, Duffy's drug-seeking behavior and noncompliance with his medications blurred the line as to the true nature and severity of his headaches.

Next, Duffy argues that the ALJ did not give appropriate weight to substantial evidence in the record.  Duffy asserts that absent polysubstance abuse, his day-to-day functioning remains markedly impaired.  However, Dr. Wiger's opinion contradicts such an assertion.  (T. 432.)  Notably, Dr. Wiger opined that Duffy is "able to handle the emotional stressors of the workplace." (*Id.*)  Dr. Moriarty and Dr. Norquist noted that the results from Duffy's MRI and neurological exam were normal.  (T. 336, 538, 540.)  Dr. Steiner testified that he did not see enough objective findings in the record that would indicate limitations from a physical point of view.  (T. 596.)  The vocational expert testified that Duffy had transferable skills and could perform a significant number of other jobs in the national economy.  (T. 580-81.)  In addition, Duffy by his own admission indicated that he was successfully employed and happily married before using significant amounts of narcotic medication.  The record also shows that Duffy attended church, drove his car, and would assist with household chores and his children's homework.  (T. 429, 557, 566.)  Thus, substantial evidence in the record supports the ALJ's finding.

In determining the credibility of a claimant's subjective complaints, the ALJ looks to several

factors as set out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984).  These factors include: daily

activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating

and aggravating factors; and functional restrictions.  *Id.* at 1322.  These factors must be considered in

the light of "the claimant's prior work record, and observations by third parties and treating and

examining physicians."  *Id.*

"[A]n ALJ may not discount a claimant's allegations of disabling pain solely because the

objective medical evidence does not fully support them."  *Goff v. Barnhart*, 421 F.3d 785, 792 (8th

Cir. 2005).  An ALJ may, however, discount a claimant's subjective complaints if the complaints are

inconsistent with the record as a whole.  *Id.*  An ALJ who determines that a claimant's subjective

complaints lack credibility must "make an express credibility determination explaining his reasons for

discrediting the complaints."  *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (quoting *Ghant*

*v. Bowen*, 930 F.2d 633, 637 (8th Cir.1991)).  If an ALJ provides such reasoning, the ALJ's

determination of a claimant's credibility is afforded great deference.  *Tellez v. Barnhart*, 403 F.3d

953, 957 (8th Cir. 2005).  A court should not "disturb the decision of an ALJ who considers, but for

good cause expressly discredits, a claimant's complaints of disabling pain."  *Goff*, 421 F.3d at 792

(quoting *Gowell v. Apfel*, 242 F.3d 793 (8th Cir. 2001)).

Here, ALJ Brown stated that he did not find Duffy's subjective complaints of disabling pain and

incapacitating limitations as fully credible because the objective findings did not support the complaints.

(T. 30.)  In his decision, ALJ Brown explains how the objective medical evidence was inconsistent with

Duffy's complaints of disabling pain.  (*See* T. 17-33.)

The ALJ, however, did not base his decision solely on the objective medical evidence, but also

discussed the functional restrictions as set forth by physicians and testifying experts.  He discussed in detail the dosage and effectiveness of the medication prescribed to Duffy, including Duffy's noncompliance with his medication and his drug-seeking behavior.  The ALJ also discussed  Duffy's inconsistent and vague statements regarding the frequency and intensity of the headaches.  ALJ Brown also discussed  Duffy's daily activities and how these factors related to the determination of credibility.

Even if ALJ Brown had failed to discuss each *Polaski* factor, the court would not reverse the decision if he gave good reasons why he discounted the complaints.  *See Dunahoo v. Apfel*,  241 F.3d 1033, 1038 ( 8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every [*Polaski*] factor is not discussed in depth.").  Here, ALJ Brown discussed these factors and discussed his reasons for discounting Duffy's subjective complaints.  Thus, the court finds that ALJ Brown complied with *Polaski* and supplied good reason to discount Duffy's complaints of disabling pain.  *See Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996).

## VIII.   CONCLUSION AND RECOMMENDATION

The court finds that, based on a review of the record, the ALJ's decision that Duffy failed to meet the criteria for DIB is based on substantial evidence in the record.  Accordingly, the court **recommends** that Duffy's Motion for Summary Judgment [Docket No. 10] **be denied** and the Commissioner's Motion for Summary Judgment [Docket No. 12] **be granted.**

Dated: 9/29/06

s/Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2 (b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **October 18, 2006.**